Good morning. Judge Abboudou and I are pleased to have our colleague, Judge Tom Barber from the Middle District of Florida to assist us with our work. Those of you who are familiar with our court know that in not-so-distant past, we frequently had judges from other circuits assist us with our oral argument calendar, but we stopped that a couple of years ago, and we don't have judges from other circuits visit with us anymore. There has been a decline in the caseload of all the circuit courts over the last several years and we are in a position now where we can do our work ourselves, but nevertheless, we have maintained our custom of inviting district judges from within our circuit after they have been on the bench for a couple of years to assist us for some days of our oral argument work. We don't have many days where we do that, but we have some. It gives us an opportunity to meet and get to know about new district judges and to hear from them how our precedents work or don't work on the ground. We appreciate it because they agree to assist us with that work over and above the work that they have. It's not like they get less work at the district court when they come and help us for a couple of days. It's a custom that I think we ought to maintain. We thank Judge Barber for helping us here this week. One of our oral arguments for this morning has been continued, so we only have two, the court granted some more oral argument time. If we need even more, the court can adjust the time accordingly as we go forward this morning. Our first case is Berry v. Crestwood. Counsel, we have read your briefs, we have read the authority cited in your briefs, we have looked at portions of the record. You have limited time this morning, so feel free to get to the heart of your argument. You are not going to waive anything by not addressing something that is in your briefs. We are probably going to have some questions. Pay attention to the traffic lights. Chief Judge Edmondson, my chief, I call him, used to say, please do not treat the red light as aspirational. Be mindful of our time. If you are answering a question from the court, though, please feel free to finish your answer. You will be on our time and you will say rebuttal if that is something that you have. For Berry, Ms. Palmer, will you come speak with us, please? Ms. Palmer, and I represent Daphne Berry, the appellant in this action. I understand the court is familiar with some of the aspects of the record in this case, so I assume then that the court is familiar with the vast number of material disputes that we have going forward. Daphne Berry was a good employee for 11 years. Crescent Hospital and CHS rated Daphne as a good worker, a key team member, an excellent resource to co-workers. And they did that just 21 days before terminating her for an alleged practice of bullying. It seemed like everything kind of changed with the February 22nd incident. And there really doesn't seem to be much doubt that that involves some misconduct, for which Ms. Berry was reprimanded at least, right? I would disagree, Your Honor. That February 26th incident actually isn't material to the retaliation claim in this case. At least the one that we brought forward on appeal. Well, I mean, it's kind of the triggering, though, of some events that end up mattering, it seemed to me, right? It is. Including the internal investigation that Friday conducted. And I get it with respect to the evaluations rating her well, but the problem, it seemed to me, was that then the authorities here, well, maybe there's something different going on here. They've had this incident, and then they conduct an investigation, and you have 24 employees interviewed, 16 of whom say that this employee has been abusive, hostile, a bully. I mean, the reports, there's just a lot of reports of that, of misconduct. And if the investigator and the decision makers, upon seeing that, believe that to be true, that seems to be a legitimate non-discriminatory reason that your client has an obligation to take head on and rebut and disprove. And I'm not sure that's happened here. So a few points, Your Honor. First, the February incident was a fake patient complaint made by a racist co-worker. That's exactly what Daphne Berry relayed to her supervisors when she made her complaint. The February incident was investigated not by Lisa Friday, but by— There's a video of it, right? There is a video, Your Honor. And whatever the motivation of the person who complained about it, I mean, they reviewed the video and determined that, in fact, there was misconduct there, right? No, Your Honor. They found that there was no misconduct. They punished multiple nurses for alleged unprofessional conduct because they were seeing— Okay, unprofessional. Yeah, unprofessional conduct. Okay. When I say misconduct, that's what I mean. It was inappropriate. Yes, and in regards, Your Honor, that's a red herring. That is not the reason that the appellees say that Ms. Berry was terminated. And we take issue with your recitation of the facts, respectfully, Your Honor, because the interviews were 24 employees. There were not 16 complaints of bullying against Ms. Berry. There were some complaints in that investigation, but there were also— I thought 16 of the 24 all described misbehavior, no? Not of Ms. Berry, Your Honor. 16 of the 24, if you look at the record, I believe it's page 25-5. Around page 3 is where we start with the investigation notes,  but those were complaints of Ms. Berry, Paul Mizell, Anna—I'm sorry, I can't remember Anna's last name— groups of mean girls, this shift versus that shift. And regardless, at the end of the day, that investigation, those notes, compared to the on-the-ground evaluation of Ms. Berry just 21 days prior to her complaint— But the evaluation is before the investigation, right? The evaluation is before the investigation, Your Honor, but— And so not informed by these interviews and these reports of bullying. We see that, Your Honor. How do we know that from the record, though? Because in the notes, a lot of the reports, the alleged reports of bullying, are actually, they predate the evaluation. They're from October, September. How do we know that the person who performed the evaluation was aware of that? Because she says so, Your Honor. In her affidavit, which is in the record, 31-1, Deborah Presnell, who is her direct supervisor, states that she was there with Daphne Berry. She worked the shifts with Daphne. She appreciated her leadership style. That's not my question, okay? Where is it that she's aware that everyone, that many, many coworkers view her as a bully? She says so in the affidavit, Your Honor. She says that coworkers who Daphne Berry has held accountable make up fake complaints about Daphne. That is a disputed fact that should be resolved by the jury. Of course, the decision makers who are evaluating this based on the investigation don't have to agree with her, right? If they go in and they interview all these employees and the employees say, one says when she's around there's chaos and continual bickering. One says she's always in the mix of everything that causes problems. Another says her horrible behaviors never address. One says there's much bullying. She's mean, doesn't allow RNs to do their jobs, yells and screams, won't help them. Another says there's much bullying and intimidation. I could go on and on and on, right? There's lots of this. And if the person doing the investigation says, notwithstanding the supervisor's view that she's good, this looks like a lot of problems. And one of the big problems is the report is there's been a lot of attrition. There's been a lot of people leaving this unit. And the other employees say they left because of her. First of all, that's hearsay that cannot be relied on for summary judgment. The employees that are there have not left because of Daphne Berry. Daphne has been there for 11 years. If these employees are leaving because of her, you would expect to see them. I'm not sure that that's hearsay. Hearsay is a statement by an out-of-court declarant introduced to prove the truth of the matter asserted. The point is that this is what is reported to the investigator and why the investigator makes a judgment that she should be fired. Yes, sir. And what was also reported to the investigator is before she even begins her investigation, Daphne calls corporate. And then the press knows. She did. She did. She absolutely did. That doesn't tell us really anything other than the fact we already know. It tells us that she is aware that Daphne is a complainer. And then in addition to that, Debra Pressnell tells the investigator, these complaints are fake. She tells the investigator. Yeah, but they don't have to credit that though, right? I mean, what you have to prove is that the decision maker who terminated her did not believe all the reports of misconduct and conclude. How do you have that? Because respectfully, Lisa Friday is not actually the one who terminated her. Lisa Friday made the recommendation. Yeah, who did? The termination comes from Bryce Wallace and Jennifer Brown. Okay. Jennifer Brown is the second direct line supervisor who is in the unit daily. Jennifer Brown is the one who signed off and approved Daphne Berry's evaluation 21 days before her termination. Yeah, but before she got this report. The report indicates that management allegedly knew about this conduct and did nothing. That would include Jennifer Brown. Jennifer Brown had no problem with the conduct if it was true. And that, Your Honor, is a question. It may not be true. And a jury could find that based on all of these pieces of evidence that we have. And respectfully, Your Honor, with regard to rebutting, that goes against Bostock and Comcast. We don't have to rebut every legitimate non-discriminatory reason. I know your Bostock argument. I mean, if your contention is that our precedents are inconsistent with Bostock,  Your Honor, I think this case is extraordinarily distinguishable from Chapman. Chapman revolves around subjective analyses. This case does not. We have documentary evidence showing that Daphne Berry disputed all of these allegations and that the company itself did not consider her a bully until she dared to complain. Real quick factual question. She got investigated because of her asking, bringing problems up, right? Exactly, Your Honor. She was investigated as part of what they're calling a employee survey because of the number of complaints. At least six of those complaints were made by Berry. Well, right, right. I mean, you're seeing it that way. I mean, another way of looking at it is that it wasn't like anybody went out and said, aha, we need to get her, we need to retaliate because she's a complainer. She got investigated as a result of her own request to look into the situation. I disagree, Your Honor. With what part? The not going out and seeking her out. I think the second they saw an opportunity, they took it. My question related, I guess, to the facts. I just want some clarity. There does appear to be in the record that there were some employment documentation, some tardiness on Ms. Berry's part as compared to once she becomes a charge nurse. Now these complaints escalate to she's angry, she's violent, she's a bully. So now you have this African-American woman who's getting charged with these kinds of complaints once she takes a supervisory role. Is that timeline correct? That is exactly correct, Your Honor. And they had no issues with her tardiness. She admitted in her deposition that she had an issue with tardiness, but that's not why they fired her. They fired her because of these allegations of bullying, which we believe are directly tied to her being a strong and vocal leader, which is what she was rated as. So those evaluations directly refer to the conduct that they are alleging is the reason they fired her, and they had no problem with it. Well, if she's being fired because she's a strong and vocal leader, that doesn't help you very much. I disagree, Your Honor. And in terms of her promotion, if I understand again the record correctly, she was promoted because she was viewed as being a strong leader and a kind of leader that this particular team needed. Exactly. And so she was promoted, and then once she becomes in charge of this team, if I understand again Ms. Berry's complaints correctly, now she's being alleged to be engaging in this unfortunate behavior. Exactly, Your Honor. And the key leader behind that was Shane Gann, who was himself violent and had outbursts, and Sheila Premu, who is known to have said she did not want to work for a black person. Okay. I think we understand. Ms. Palmer, you've saved four minutes for rebuttal. Let's hear from Mr. Hargrove. May it please the Court, good morning. I am John Hargrove here. I'm here on behalf of the Appalachian Crestwood Healthcare and CHS Professional Services. As we've already discussed, this case involves a discharge of a departmental nurse leader who had been the subject of numerous complaints. If I may, Counselor, just to be clear, assuming we're using the McDonnell-Douglas test, which I understand the parties agree is the appropriate test, do you agree that I think Ms. Zell and Gann were the correct comparators for purposes of the treatment Ms. Berry received as compared to them, or are there others who should have been considered? We would disagree with that, Your Honor. There's never been in the history of the hospital, and certainly this department, anybody who's had this many complaints brought against them at the same time, resulting in a full and complete investigation by an outside professional human resources expert who came in and said, I've never seen anything this egregious in the 18 years that I've done this. So when we talk about Shane Gann or Paul Mizell or these others, they don't even remotely come close to what occurred with this particular plant. So your point is that they're not similarly situated? They're not similarly situated, Your Honor, and certainly to the extent that you would argue that, that the hospital has come forward with a legitimate non-retaliatory reason saying that their situation became completely different after this full investigation. Prior to her promotion, were there any allegations in her record that she was a bully or violent or disrespectful in any way that were considered prior to her promotion? I don't believe so, Your Honor. There were lots of markings of needs improvement and unacceptable, but there was none that were checked bullying. And would you agree that a complaint prior to her promotion that maybe she had some excessive tardies is very different from a complaint after she was promoted that she is a bully and engaging in other misconduct? Yes, Your Honor. I believe that what happened with regard with this meltdown, if you want to call it, within the emergency department, that was a disruptive event. So it is completely different from any of the good things that had been ever said about her and it's completely different from any of the negative things that had ever been said about her. It completely caught the hospital off guard. Yes. I may have one disagreement with my colleague, but I didn't understand that the plaintiff was necessarily relying only on the McDonnell-Douglas framework. I understood that she thought she could satisfy that framework, but she also argued, as I understood it, that even if you set aside that framework, there is a convincing mosaic array of circumstantial evidence that would allow her to get to a jury. And I understand that you had said that she forfeited that. It seemed to me from reading the record that she did not forfeit that, that she did make a convincing mosaic argument in the district court, although she may be bringing up matters that are reflected in the record, but not necessarily exactly the way she framed that argument in the district court. But you can develop the argument in a different way on appeal so long as the issue is preserved. It seemed to me the issue was preserved. We did make the waiver argument. It's not one of our principal arguments. Part of the reason we made it is because the district court on the motion to amend or to rehear specifically laid out in a page or two how all these new arguments were being made in the motion to amend that had never been brought forward for him to consider at the summary judgment stage. And so we did want to preserve that on appeal, but, Your Honor, it's not one of our principal arguments. And, in fact, the district court reviewed her claims under three different standards, McDonald-Douglas, the convincing mosaic, as well as just generally whether there was sufficient circumstantial evidence. I agree with that, Your Honor. One thing, just as a matter of law, that's not clear to me is whether the second and third of those are any different. So I understand. I think the McDonald-Douglas framework is just that, a framework, with a burden of proof that there's a burden of persuasion and burden of production. We all know how that framework works. I don't view convincing mosaic as really anything other than a metaphor for the idea that you're not necessarily bound to use McDonald-Douglas if you have circumstantial evidence from which a reasonable trier of fact could determine that there was discrimination. It also doesn't seem to me we've ever held in a published opinion that that framework, if you want to call it that, that metaphor works in a case of retaliation, but I'm having a hard time understanding why it wouldn't. Right. And so, Your Honor, obviously the McDonald-Douglas case was handed down by the Supreme Court many, many years ago, and we followed that. It involved a failure to promote case, and there were certain elements that were laid out. Since then, the circuit courts all across the country have adapted that framework to fit into termination decisions, disciplinary decisions, to fit into not a discrimination setting but into a retaliation setting. So that's what we have here. Here's what the Supreme Court has said, though. The McDonald-Douglas, or we've said this, based on Supreme Court precedent, the McDonald-Douglas framework is not and never was intended to be the sine qua non, right, for a plaintiff to survive a summary judgment in an employment case, period, right? And so if we look at McDonald-Douglas in the retaliation setting, what the initial requirements are, protected activity, adverse employment action, and then this key thing is called causation. There has to be a causal element. Now, typically in a discrimination setting— In this case, if you didn't have the legitimate nondiscriminatory reason, the causal element would be easy to satisfy with temporal proximity. I mean, she's complaining all the way up to the termination decision, right? Right. And so with this causal in the discrimination context, often it's required to have a comparator or you're replaced by someone outside of the protected class. So the convincing mosaic standard evolved to say many times you don't have that in the discrimination setting and a plaintiff should be able to go forward and not be able to show a comparator. In the retaliation context, though, it's never been required. So when you come in and you talk about the convincing mosaic, it's quite similar. It's very similar to what was already required under McDonnell Douglas in this third part. There's protected activity, adverse action, and then the causal elements. Let me make sure I get this. Let's say it wasn't whacked, okay? You agree that a plaintiff can prove a case of retaliation, a circumstantial evidence case, at least theoretically, without using McDonnell Douglas. We would argue, Your Honor, first that this convincing mosaic standard has never been adopted by this court. Granted. There's no reason for us not to, though, right? Well, it's different because it evolved to fit in with a discrimination setting where comparators were not. All it really is, I mean, convincing mosaic isn't like a framework like McDonnell Douglas. Would you agree with me about that? It's just a way of describing a circumstantial case that doesn't use McDonnell Douglas framework that gives rise to a reasonable inference of discrimination and maybe retaliation, right? And so we would argue that if it is going to be adopted in a retaliation context by this court in this case, it merely fits into this causal element in McDonnell Douglas. It doesn't supersede McDonnell Douglas. It doesn't replace what the Supreme Court has told us that we're supposed to do. It merely fits into that element. So what happens after that? No, I can't. I don't understand that. It seems to me that a civil litigant, any plaintiff in a civil case can prove their case by circumstantial evidence. And McDonnell Douglas is just one framework for proving a circumstantial evidence case. Why would we be limited to the causal element? Why wouldn't a plaintiff have the opportunity to just present a circumstantial case that gives rise to a reasonable inference of retaliation? Whatever it is. Because what happens under the Supreme Court's guidance in McDonnell Douglas is that burden shifts to the defendant. And the defendant must come forward with a legitimate non- The burden of proof always stays with the plaintiff. The Supreme Court is very clear about that. All it is, it's a burden of production on the part of the employer to proffer a legitimate non-discriminatory reason. But that's McDonnell Douglas, okay? So when the defendant comes forward with that, it's still, the burden still rests upon the plaintiff to argue with that and prove and bring forth enough evidence to get past summary judgment to show that legitimate non-discriminatory or non-retaliatory reason does not meet the McDonnell Douglas. Now, what's an example of that? Let's say we have a woman who brings six complaints in her nursing department and there's temporal proximity, but we don't consider anything else. But if we follow the McDonnell Douglas standard and we look at the legitimate non-retaliatory reason, what if she comes to work with a gun? What if she embezzles money? What if she sells drugs at work? What if she steals a company car? Those things disrupt the initial prima facie case that's made under this circumstantial evidence theory, convincing mosaic theory that would plug into the causation analysis and gives the defendant the opportunity to come forward and say, this was the reason we actually made the employment decision. Just a second. So in your example, then the mosaic isn't convincing. Right. Right. It's still, it's the law, but under those facts, it wouldn't be a convincing mosaic. It's not because it bears some relationship to the causal element McDonnell Douglas. It's just because it's no longer, with that record, convincing. Well, I suppose it could be developed that way. As long as the legitimate non-retaliatory reason and the pretext analysis survived, the implementation of the convincing mosaic standard in this setting. Now, the convincing mosaic standard does refer, in the third element of it, to pretext. So, you know, there would be an ability. There's not an element. I mean, there's not a, there's, no, we haven't ever said that a convincing mosaic of circumstantial evidence has elements, have we? Well, there's the first option is suspicious timing. That's one thing we've said might be part of a convincing mosaic. That's all we've said, right? Right. And then there's a second part that's called bits and pieces. And then there's this third part that's called pretext. Bits and pieces. Yeah, so. It doesn't sound like much of a test to me. Bits and pieces. It's in the opinions, Your Honor. Granted. So we felt obligated. But once the defendant, once we come forward with this legitimate non-discriminatory reason, which is 22 interviews by an outside professional, human resource professional. I thought it was 24. 24 interviews and 16 of whom reported the bullying. And two contradicted. So, I mean, it's not. And do you know the race? If they were in the briefs, you know, the African-Americans, if they were African-American, that seems to be identified. For those who were white, it was not always identified. So do you know the racial composition of all those people who were interviewed? Your Honor, I do not. And for two reasons. One, obviously, the only issue on appeal is retaliation. And we're not. The race case. That is true. I appreciate that. But it seems like even the district court took into consideration the evidence related to racial discrimination in determining whether or not retaliation occurred. Is that true? You would agree with that? Like in the Lockheed Martin case where there was a spreadsheet showing the races of the employees and that was a very terrible piece of evidence. That type of evidence doesn't exist in this case. No one was ever recorded by race in terms of the complaints. The complaints were bullying, threatening, using unbelievable foul language, pushing people against the wall. There's something in there about gay people also. Wasn't there some comment that they said she was demeaning gay people? I read that in the judge's order. I could quote it for you. Demeaning gay people. There was a comment about one employee about that. There was one. So there was one employee who said that, but does the record show whether or not that comment was ever verified? Well, Your Honor, those are all in the statements that were taken by the professional human resources person. There was not one single deposition taken of any of these witnesses. Okay. Would you agree that if you knew the race of all of those who were interviewed, again, for purposes of the retaliation in her foundational basis for her complaints, that that would lead towards, if we're going to move in the convincing mosaic direction, would help to provide additional circumstantial evidence as to whether or not she indeed was retaliated for complaining about perhaps a racially insensitive or intolerable work environment? I think so, Your Honor. I think if you interviewed all the witnesses and all the African Americans took one view and all the others took a different view, that would look very suspect. But that's really not what we had here. Is it suspect that the race of those who were interviewed are not identified before us or in the record? I don't think so, Your Honor. I don't think that would have been appropriate. That certainly was not appropriate in the Lockheed Martin case. I mean, the court highly criticized that. The plaintiff has the burden, right? The plaintiff would have the burden of doing that, right, and making that argument, right? And those that are related to that are depositions taken or that pursued. One last factual point I may have missed. You've said a couple times an independent human resources. I was just under the impression that Friday was somebody within the hospital corporation. She was an independent consultant? It's a separate entity in the community health system. It's called their professional services corporation. And when they have something as egregious as this or disruptive as this, they'll bring her in from the outside to go anywhere. Where is that reflected in the record? It should be in her deposition, exactly who she is and what she does. I didn't realize that was an issue. But she was deposed. And her entire deposition is in the record? I believe so, Your Honor. But just to be clear, is she really independent or she just works for a different office within the same corporate entity? Or is this an independent consultant who works for other companies? There is a common parent way above, many levels above, if that's what Your Honor is asking. But you're saying it's a separate corporation within a corporate family? Completely. This woman, this plaintiff in this case, did not work for this other company, did not receive money from her, had no reporting structure. None of the details of her work were controlled by anyone in this other entity. It's purely a professional services corporation to come in and try to deal with situations like this. Thank you, Your Honor. Thank you. Ms. Palmer, you have four minutes. Judge Barber, in response to your question about Lisa Friday, she absolutely is involved. She absolutely is part of the company that we sued. Is it true it's a separate, technically, in a corporate structure? In a corporate structure, yes. It is a separate professional corporation for human resources purposes? Yes, and we briefed on below a joint or agency issue, but that was not addressed by the court. CHS Corporation does the handbook that everyone is subject to. They're referred to as corporate throughout the hospital, and that's what we're dealing with here, so we believe that. Also, with regard to her interview with Daphne Berry, Daphne complained directly to Ms. Friday. Ms. Friday's response to her was, I can tell you're a strong leader, and people are going to be jealous of you, so you need to suck it up. And that's what she told her when she complained about race discrimination. So tell me this. What in the record would support an argument for you? A lot, Your Honor. Oh. Let me finish. That the reason for her firing was not that lots of employees had reported violence, hostility, abuse, bullying, all that sort of thing, and faced with something that was really kind of unprecedented, those levels of complaints. The Corporation said, more trouble than it's worth. May have some strong points, but it will improve morale, and going forward we're better off if we lose this employee. Based on that. You have to take that head on and rebut it to prove that's not really their reason. Your Honor, I know we disagree on this issue, but I do not think we have to take that head on because of that. Let's assume you do. Good. Let's assume you do. Assuming we do, Your Honor. We have Paul Mizell was placed on a performance improvement plan for bullying, and if you read his performance improvement plan, which is in the record, it's very clear that he belittles employees and makes talks down to them. Any report that he used violence? He was not the one with violence, Your Honor. And then after he was placed on a performance improvement plan, he had another occasion of bullying. And after that, they moved that nurse that he was bullying under Daphne Berry, which tells you they did not believe she was a bully. Daphne Berry was never placed on a performance improvement plan. That's disputed in the record. Shane Gann is the nurse who had the violence, and his violent outbursts. You can't win that by just simply quarreling with it, whether it's true or not. That's what our case law says. You have to prove that really wasn't the reason, after they've conducted this investigation, that they fired her. And none of that proves that. I disagree, Your Honor. Chapman says that we can't quarrel with it. But if you look at Chapman, that's completely distinguishable from this case. In Chapman, the employee just disagreed with their reason and tried to recast it and said something along the lines of, oh, well, that person also had a lot of jobs. When the employer said, we don't like that you've had a lot of jobs in a short period of time. That's not what happened here. We have documentary evidence from the company that disputes that they could think this was a real reason. If you look at the record at 27-28, page 45, there's a compliance report from Rita Wallace, who's one of the decision makers, that references an unimaginable amount of bullying, and it's dated April 16th. And she says that she believes that the group of nurses that was suspended may have behavior that could be seen as bullying, but that's not been validated. Then they have an investigation that validates it. I disagree, Your Honor. I think that investigation does not validate it. I think it calls it into question even more. And respectfully, if you look to the race of everyone, it is in the record in Ms. Berry's deposition that she's the only black nurse. Okay. I think we understand your case, Ms. Palmer. Your Honor, may I address Judge Abudu's comment about McDonnell Douglas briefly? Sure. We disagree that McDonnell Douglas applies specifically because McDonnell Douglas is a sole cause. You don't disagree that it applies. You don't think it's the sole method by which you can prove retaliation. You'd be happy. You'd think you would like to use McDonnell Douglas if it wins, right? But you would also— I don't have anything to say. Exactly. That's what I thought. And this court said in Quigg that— You agree with me that you could also prove it through a convincing mosaic of circumstantial evidence, right? And you're not limited to McDonnell Douglas, but you do present arguments about why you satisfy McDonnell Douglas, right? If you look at the plain text of the statute, the question is simply, did you present a circumstantial case? Thank you, Ms. Palmer. Blue Cross Blue Shield.